**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

| | | |
|---|---|---|
| **MARK A. WEAKLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Docket No. 3:12-1180** |
| | ) | |
| **NASHVILLE MACHINE ELEVATOR** | ) | **JUDGE TRAUGER** |
| **COMPANY, INC.,** | ) | |
| | ) | **JURY DEMAND** |
| **Defendant.** | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES now Plaintiff, MARK A. WEAKLEY, by and through counsel to respond in opposition to Defendant's Motion for Summary Judgment in accordance to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff responds as follows:

### I. FACTUAL SUMMARY

Plaintiff, Weakley, began working for the Defendant on January 15, 1986, as an apprentice. (Ex. 1, Weakley Depo., p. 12). Weakley went through an elevator school program offered by the Union and became a journeyman, which is also known as a mechanic. (Ex. 1, Weakley Depo., pp. 13-14). As a mechanic for Defendant, Weakley's responsibilities were to install the elevator, which included installing the door frame and the doors properly for operation. (Ex. 1, Weakley Depo., p. 14). Weakley is a member of the International Union of Elevator Constructors. (Ex. 1, Weakley Depo., p. 15).

Weakley filed his Complaint with this Court on November 13, 2012, alleging that he was harassed and terminated for testifying in the case of *Robert Cervantes v. Nashville Machine Elevator Company, Inc.*, Middle District of Tennessee, U.S. District Court Docket No. 3:09-cv-

0975. (D.E. No. 1, Complaint). For the case at-bar, Plaintiff feels a brief summary of the *Cervantes* case would assist this court in its deliberation.

## A. *Cervantes* History

Cervantes is an Hispanic male. (Ex. 2, Cervantes Depo., taken for *Cervantes*,[1] p. 139-141). Cervantes was hired as a construction helper/temporary mechanic ensuring mechanics were prepared with tools and materials for elevator installation. Cervantes worked for Defendant[2] during two significant time periods, 1999 thru 2006 and July 2007 through May 2009. (Ex. 2, Cervantes Depo., taken for *Cervantes*, pp. 31-34). Cervantes was terminated in 2006 due to his absenteeism, but then rehired in July 2007. (Ex 2, Cervantes Depo., taken for *Cervantes*, p. 74, 81) In this trade, all employees including Cervantes and Weakley, were subjected to numerous periodic layoffs due to lack of work but would then be called back to work subject to their collective bargaining agreements. (Ex. 2, Cervantes Depo., taken for *Cervantes*, pp. 59-61, 63-64, 76-77)(Ex. 1, Weakley Depo., pp. 17-18)(Ex. 3, Barber Depo., p. 5). These layoffs had nothing to do with Cervantes's, or any other employee's, job performance. (Ex. 4, Halfacre Depo., taken for *Cervantes*, p. 11). In fact from 1999 thru 2006, Cervantes was laid off, along with other employees, for lack of work and repeatedly brought back, or "re-hired," by Defendant. (Ex. 2, Cervantes Depo., taken for *Cervantes*, p. 59-61, 63-64, 76-77). It is not uncommon for Defendant to hire, rehire, or bring back from lay-off employees with criminal records. (Ex. 5, Skinner Depo., taken for *Cervantes*, p. 82-86). In July 2007, Larry Skinner recommended Cervantes be rehired at Defendant because he was qualified

---

[1] Plaintiff has inserted the phrase "taken for *Cervantes*" to assist this Honorable Court in distinguishing between the depositions taken in both the *Cervantes* matter and the *Weakley* matter. Only the depositions taken in the *Cervantes* case will be noted and any depositions without the phrase were taken for the *Weakley* case. All deposition excerpts have been filed contemporaneously with Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment and are noted as exhibits.
[2] Both Robert Cervantes and Mark Weakley were employed with Nashville Machine Elevator Company, Inc., and therefore, the term "Defendant" refers to Nashville Machine Elevator Company, Inc. throughout Plaintiff's response.

to do the job.  (Ex. 5, Skinner Depo., taken for *Cervantes,* p. 45-47).  From July 2007 until his lay-off, Cervantes worked continually in this capacity with no performance issues.  (Ex. 5, Skinner Depo., taken for *Cervantes,* p. 51-65).

On or about May 11, 2009, Cervantes was laid off with other workers. (Ex. 6, Cervantes's Complaint ¶ 12).  The reason given was lack of work.  Cervantes was told by management that he and other workers would be called back in approximately one year. (Ex. 6, Cervantes's Complaint ¶ 12).  However, within one month, Defendant began bringing laid off workers back to work. (Ex. 6, Cervantes's Complaint ¶ 12).   Defendant brought back employees outside of Cervantes's protected class, Hispanic.  (Ex. 6,Cervantes's Complaint ¶ 12). Cervantes's supervisor, Larry Skinner, had the final decision, or substantial influence, as to who was brought back, or "rehired" and who was not from the layoffs.  (Ex. 6, Cervantes Depo., taken for *Cervantes,* p. 89-90)(Ex. 5, Skinner Depo., taken for *Cervantes,* p. 48-51, 86-88)(Ex. 4, Halfacre Depo., taken for *Cervantes,* p. 14). Sam Chitty was the General Manager of Defendant but did not work with Cervantes or other employees on a daily basis to compare employee's performance nor did the company complete performance evaluations on their employees that could be used to determine the better employees for "rehire."  (Ex. 5, Skinner Depo., taken for *Cervantes,* p. 48-51, 73).

Cervantes was discriminated and retaliated against in the re-hire process and job assignment process of Defendant due to being Hispanic.  (Ex. 2, Cervantes Depo., taken for *Cervantes,* p. 98-135).Cervantes was also subjected to racial remarks while employed with Defendant. (Ex. 2, Cervantes Depo., taken for *Cervantes,* p. 33-42).   The construction supervisor, Larry Skinner, would routinely refer to Cervantes as "fat Mexican," "Julio," "G– D---- Mexican,""burrito" and would tell Cervantes that he was "the closest thing to a n-----" because

of Cervantes's dark complexion.  (Ex. 2, Cervantes Depo., taken for *Cervantes,* pp. 33-42, 92-98)(Ex. 8, Escobedo Depo., taken for *Cervantes,* pp. 1-15, Exhibit 1)(Ex. 9, Boyd Depo., taken for *Cervantes,* pp. 1-29, Exhibit 2)(Ex. 10, Hunter Depo., taken for *Cervantes,* pp. 1-19, Exhibit 3)(Ex. 11, Garshenick Depo., taken for *Cervantes,* pp. 1-13, Exhibit 4)(Ex. 12, Sheppard Depo., taken for *Cervantes,* pp. 1-33, Exhibit 5)(Ex. 13, Bawcum Depo., taken for *Cervantes,* pp. 1-10, Exhibit 6).  (Ex. 14, Smalley Depo., taken for *Cervantes,* pp. 7-8)(Ex. 15, King Depo., taken for *Cervantes,* p. 7)(Ex. 16, Meehan Depo., taken for *Cervantes,* p. 7)(Ex. 17, Hampton Depo., taken for *Cervantes,* p. 7)(Ex. 18, Roberts Depo., taken for *Cervantes,* p. 6)(Ex. 19, Weakley Depo., taken for *Cervantes,* pp. 7-8) (Ex. 20, Holcomb Depo., taken for *Cervantes,* p. 8)(Ex. 21, Sayles Depo., taken for *Cervantes,* p. 7).    Cervantes complained of the discrimination and harassment to Larry Skinner, Sam Chitty, Rick Halfacre, and Timothy Schultz. (Ex. 6, Cervantes's Complaint ¶ 17)(Ex. 2, Cervantes Depo., taken for *Cervantes,* pp.. 33-42, 48, 53-54, 56-57, 59, 78-79, 80-81, 92-98)(Ex. 22, Schultz Depo., taken for *Cervantes,* p. 22). Timothy Schultz actually confronted Sam Chitty about Cervantes's complaints of the verbal abuse by Larry Skinner just prior to the May 2009 layoffs.  (Ex. 22, Schultz Depo., taken for *Cervantes,* pp. 22-23).   Cervantes actually confronted his supervisor on multiple occasions demanding the treatment cease.  (Ex. 2, Cervantes Depo., taken for *Cervantes,* p. 50-51).  Cervantes was also subjected to his supervisor, Larry Skinner referring to  African American employees as "damn stupid niggers."  (Ex. 2, Cervantes Depo., taken for *Cervantes,* p. 43-44). Larry Skinner admits to racial references towards Cervantes and African-Americans.  (Ex. 5, Skinner Depo., taken for *Cervantes,* pp. 26-28).  The harassment, retaliation and discrimination rose to such a level that it substantially interfered with Cervantes's ability to perform his job.  (Ex. 2, Cervantes Depo.,

taken for *Cervantes,* pp. 33-42, 49). Sam Chitty agrees that Cervantes was subjected to a hostile work environment. (Ex. 2, Cervantes Depo., taken for *Cervantes,* pp. 35-37).

Defendant had no Human Resources Department for employees to take their concerns and gave no training on discrimination in the workplace and hostile environment. (Ex. 5, Skinner Depo., taken for *Cervantes,* pp. 5-14, 41)(Ex. 7, Chitty Depo., taken for *Cervantes,* pp. 1-10). Sam Chitty is responsible for investigating EEOC complaints against Defendant. (Ex. 7, Chitty Depo., taken for *Cervantes,* p. 18). In response to Cervantes's EEOC charge, the only thing Sam Chitty did was to have four employees, out of sixty under Larry Skinner's supervision, fill out a questionnaire about slurs used by Mr. Skinner. (Ex. 7, Chitty Depo., taken for *Cervantes,* p. 18-34). The names of these four employees were given to him by Larry Skinner. (Ex. 7, Chitty Depo., taken for *Cervantes,* pp. 18-26, Exhibit 7).

Cervantes's trial occurred on May 17, 2011 before the Honorable Judge Nixon and continued until May 23, 2013. Weakley testified in a deposition on behalf of Cervantes and at the trial on May 18, 2011, corroborating Cervantes testimony that Larry Skinner used racial slurs in the workplace. Sam Chitty, General Manager, was present for all depositions taken and every day of the trial in the *Cervantes* matter watching Mr. Weakley testify. (Ex. 29, Chitty Depo., pp. 102-103). The jury found in favor of the plaintiff in *Cervantes*, but Chitty does not think the jury was correct. (Ex. 29, Chitty Depo., pp. 102-103). The jury returned in favor of the Plaintiff awarding compensatory and punitive damages.

### B. Weakley's Employment After the *Cervantes* Trial

Weakley was not employed with Defendant at the time of either his deposition or trial testimony in the *Cervantes* case. (Ex. 1, Weakley Depo., pp. 62-64). Weakley was laid-off from Defendant on May 23, 2010, and rehired on July 12, 2011. (Ex. 1, Weakley Depo., p. 19). Since

Weakley is in a Union with a collective bargaining contract with Defendant, Defendant had to hire him because they had no reason to pass him over for a position with their company. (Ex. 1, Weakley Depo., p. 65). However, Weakley was treated different after his testimony than before he testified that his supervisor, Skinner, had racially harassed Cervantes. (Ex. 1, Weakley Depo., p. 61).

In August 2011, Weakley was called into the office to meet with Chitty, his supervisor, and placed on probation for his work on the First Baptist Church in Inglewood. (Ex. 1, Weakley Depo., p. 22). Chitty explained to Weakley that the door frame was set wrong to an elevator. (Ex. 1, Weakley Depo., pp. 22-23). Weakley advised Chitty that he thought the probation was unfair because he wasn't the first one to make a mistake on a door frame in the company. (Ex. 1, Weakley, Depo. p. 23).

Weakley explained that at First Baptist the work truck showed up and everyone was in a hurry to load their equipment. Weakley could not inspect the last door frame since he was being moved off of that particular job to another one. (Ex. 1, Weakley Depo., pp. 23, 26)(Ex. 23, Crews Depo., p. 17). Weakley did not know that the door frame was misaligned until the adjuster, Dale Crews, came two weeks after Weakley left the work site. However, by this time, the door frame was already "blocked up" meaning that masonry employees had already laid bricks around the edge of the opening. (Ex. 1, Weakley, Depo., p. 26)(Ex. 23, Crews Depo., p. 32). This project was for three landings (floors) and the only door frame that was misaligned was on the bottom floor; the other two doors were set and working properly. (Ex. 1, Weakley Depo., p. 26). A mechanic with Weakley's experience cannot look at a project and tell it is misaligned without the side walls or the elevator door. The elevator door was left upstairs so the block layer could finish the project. (Ex. 1, Weakley Depo., p. 27). Weakley was not the first

employee with Defendant that has had to redo his work; however, he is the first to get written up and placed on probation. (Ex. 1, Weakley Depo., p. 23).

When the adjuster, Crews, noticed that the elevator doors would not close, he contacted Larry Skinner, Weakley's supervisor, and told Skinner he could make the doors work. (Ex. 23, Crews Depo., p. 17). Skinner told Crews "no" and that this was another reason for him [Skinner] to "get him" or fire him, referring to Weakley. (Ex. 23, Crews Depo., pp. 17-18). Crews could have made the doors work. (Ex. 23, Crews Depo., p. 18). Skinner contacted Chitty, general manager, and advised him of the situation, as it is Skinner's job responsibility to notify Chitty of any disciplinary issues for Nashville Machine employees such as Weakley. (Ex. 29, Chitty Depo., p. 5-8).

Chitty relies on Skinner to bring to his attention policy violations and disciplinary infractions of field employees, mechanics, apprentices, and helpers because he [Skinner] is the department head. (Ex. 29, Chitty Depo., pp. 8-9).

Crews also believes that if Skinner would have left Weakley on the project and not pulled him off to go to another job, then Weakley would have known that the doors were not functioning correctly and fixed them prior to the doors being "blocked in." Skinner was noted for pulling people off jobs early. (Ex. 23, Crews Depo., pp. 17-18). Crews inspected all Defendant's mechanic work as an adjuster. (Ex. 23, Crews Depo., p. 27) Crews knew Weakley did as good a job as the other mechanics and never knew Weakley to try and cover up a mistake without correcting it or not telling anybody. (Ex. 23, Crews Depo., pp. 28-29).

Crews was contacted by Sam Chitty in April 2012 and was asked to sign a statement against Weakley from the First Baptist worksite. (Ex. 23, Crews Depo., p. 21). Crews advised Chitty that he did not like to sign papers against employees and Chitty threatened Crews with

termination alleging insubordination. (Ex. 23, Crews Depo., p. 13). Crews refused to do what Chitty asked and Chitty took his work van away from him. Crews had to call his wife to come to Nashville from Columbia to pick him up from work. (Ex. 23, Crews Depo., p. 13). The next day, Crews wrote what Chitty told him to write and signed his statement in order to keep his job. (Ex. 23, Crews Depo., p. 12). Crews' job had not been threatened previously in regards to writing a statement about an employee's work product. (Ex. 23, Crews Depo., p. 35).

In September 2011, Weakley was called into another meeting with Chitty and terminated due to Weakley's work performance on the VA Hospital project. Larry Skinner was present for the meeting as well. (Ex. 1, Weakley Depo., pp. 32-33).

Weakley and his helper, Davis Cruz, were working on the platform to set the doors frames to the elevator at the VA Hospital. (Ex. 1, Weakley Depo., pp. 34-35). Weakley was gathering brackets to mount the frame and when he turned around Cruz knocked the door frame down. (Ex. 1, Weakley Depo., p. 34). Weakley and Cruz picked up the door frame but did not see any damage. Five minutes later, the door frame fell over again. (Ex. 1, Weakley Depo., p. 34). Weakley picked up the frame, saw the dent at the top of the frame and zip screwed it repairing the dent. (Ex. 1, Weakley Depo., p. 34). Weakley advised Cruz to be careful and not to drop anymore frames. (Ex. 1, Weakley Depo., p. 35). A day or two later, Bryan Connors, adjuster, came to the site to inspect Weakley's work. Connors advised Weakley that there was a ding in the door and that he [Connors] would need to call the supervisors to have the door repaired. (Ex. 1, Weakley Depo., p. 37). Weakley advised Connors that he should call before the door was blocked in and Connors contacted Chitty. (Ex. 1, Weakley Depo., pp. 37-38). The damage to the door was at the middle of the bottom part of the frame and was noticed a day or two after Weakley had set the door frame. (Ex. 1, Weakley Depo., p. 38).

### C.    Previous Incidents of Employees of Defendant

Defendant contends in its Motion for Summary Judgment that Weakley was costing them too much money because two door frames had to be re-done. Damage to equipment, elevator doors and frames resulting in a financial cost is nothing new to Defendant. Chance Bawcum, another mechanic that Defendant employed, was assigned as foreman on Green Hills project. (Ex. 24, Bawcum Depo., p. 27). On the last elevator of the project, Bawcum had set the door frame wrong, was pulled away from the job and the door frame was blocked in. (Ex. 24, Bawcum Depo., p. 27). After Bawcum left, two other crews came to the worksite and set the remaining door frames to the same measurements that Bawcum used on the first door frame. Therefore, all three (3) door frames were set and blocked. (Ex. 24, Bawcum Depo., p. 27). All three door frames were wrong and had to be torn out and redone. (Ex. 24, Bawcum Depo., p. 27). Bawcum did not receive any discipline for this incident. (Ex. 24, Bawcum Depo., p. 28).

Dale Crews, adjuster, has seen many instances where mechanics with Defendant have made mistakes and didn't report it to their supervisors. (Ex. 23, Crews Depo., p. 28). Crews never saw any discipline administered for employees fixing their mistakes and not reporting them to management. (Ex. 23, Crews Depo., p. 28).

It was also typical that damage could be done to the door frames after the mechanics had completed their job. Drywall workers would bump into them, painters would get paint on them, and trash collectors would run their carts into the frames during and after the installation process. (Ex. 3, Barber Depo., p. 8).

Tim Aric and Tony Barber, both mechanics, were at the Suntrust building on a project when a rope broke and a steel hoist was dropped. (Ex. 3, Barber Depo., p. 14). Aric and Barber were pulling the hoist up by a rope at an angle against the edge of a piece of steel. The fraying

and the weight of the hoist snapped the rope and the hoist fell. (Ex. 3, Barber Depo., p. 14). The hoist weighed about 250-300 pounds and fell fourteen (14) floors, destroying the hoist. (Ex. 3, Barber Depo., pp. 15-16). The hoist hit the several beams and the platform, causing damage including a dent in the elevator platform. Aric and Barber had to straighten the dent out. (Ex. 3, Barber Depo., pp. 16-17). Neither Aric nor Barber were disciplined by Skinner, their supervisor. (Ex. 3, Barber Depo., pp. 15-16).

Weakley had never seen anyone in his 26 years with Defendant receive a write-up, let alone be terminated, because something was damaged or scratched. (Ex. 1, Weakley, Depo., p. 58). McMurray, an adjuster for Defendant, only knows of one person, Weakley, that has been terminated for causing damage to door frames or elevator doors. (Ex. 25, McMurray Depo., p. 9). It was common that damage would occur while the mechanics and helpers were working on the door frames and elevator doors. If the mechanic had the capability of fixing a frame or doors, then the mechanic would repair the damage and would not notify their supervisor. (Ex. 26, Hazelwood Depo., p. 15). Furthermore, after the mechanics finish with the door frame, other trades come in and install block and dry wall around the elevator doors which could damage the door or frame. (Ex. 25, McMurray Depo., p. 21).

Mark Weakley was the only mechanic that was disciplined for damage to the door frame and elevator doors. Other mechanics were not disciplined for making the same mistakes. (Ex. 27, Aric Depo., p. 15)(Ex. 3, Barber Depo., p. 10)(Ex. 28, Connor Depo., p. 12)(Ex. 25, McMurray Depo., p. 12).

Defendant argues that Hazelwood's issue at the West End project was not his mistake but happened because it was a unique job. That isn't an accurate depiction of what happened. Alan Hazelwood, foreman, set four door frames in the wrong position at a job on West End. (Ex. 24,

Bawcum Depo. ,pp. 31-32, 40). Chance Bawcum, mechanic, was working on one of the elevators. (Ex. 24, Bawcum Depo., p. 32). Bawcum asked Hazelwood why the door frames were set wrong and Hazelwood advised that he didn't look at the blueprints. The blueprints stated the measurements that were to be used to set the service elevator door frame. (Ex. 24, Bawcum Depo., pp. 38-40). Skinner, Hazelwood's supervisor, had a crew come in on the weekend and paid them overtime to tear out and reset the frames. (Ex. 24, Bawcum Depo., p. 32). The job entailed tearing the door frames and seals out and resetting the door frames on every floor, which was probably two to three days of work to fix Hazelwood's mistakes. (Ex. 24, Bawcum Depo., p. 40). No one was punished by Skinner for this incident. (Ex. 24, Bawcum Depo., p. 32).

Furthermore, other employees have been charged with crimes during their employment with Defendant and have not been disciplined or terminated. Barber, a mechanic, was convicted of domestic violence in 1998. (Ex. 3, Barber Depo., p. 20). Connor, adjuster, was charged with DUI, evading arrest and was arrested in a domestic dispute with his wife. (Ex. 28, Connor Depo., pp. 25-28). Hazelwood, mechanic, has been convicted of simple possession of marijuana twice. Connor and Kenny King, another employee, were with Hazelwood when he was charged with his last possession of marijuana. (Ex. 26, Hazelwood Depo., pp. 34-35). Connor, as noted above, was charged with DUI and King was charged with public intoxication. (Ex. 26, Hazelwood Depo., p. 36).

## II. STANDARD OF REVIEW

Defendant as moving party has the initial burden of showing the Court, by reference to the record, the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the non-moving party has the burden of proof at trial, the movant must carry the initial burden in

one of two ways: either by negating an essential element of the non-movant's case or by showing that there is no evidence to support a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 606-08 (11th Cir. 1991). Bold, conclusory statements that the Plaintiffs cannot meet their burden at trial are insufficient. Only after the movants have met their initial burden does the burden shift to the non-moving party to "demonstrate that there is indeed a material issue of fact that precludes summary judgment." 929 F. 2d at 608.

Summary judgment is inappropriate unless the evidence is so one-sided that a reasonable jury could arrive at only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Id.* at 255. Under F.R.C.P. 56, the Court's role is narrowly limited to assessing the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *Id.* at 249. Thus, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *See Hunt v. Cromartie*, 526 U.S. 541, 550-555 (1999.

Reasonable inferences are inferences reasonably drawn from all facts then before the Court, after sifting through universe of all possible inferences the facts could support. Reasonable inferences are not necessarily more probably or likely than other inferences that might tilt in the moving party's favor. Instead, so long as more than one reasonable inference can be drawn, and that inference creates a genuine issue of material fact, the trier of fact is entitled to decide which inference to believe and summary judgment is not appropriate. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

Further, it is well established that questions concerning a person's state of mind (such as motive, knowledge, intent, good faith or bad faith, malice, fraud, conspiracy or consent) are rarely disposable at the summary judgment stage. *See Hutchinson v. Proxmire*, 443 U.S. 111 (1979). Based on this standard, it is clear that Defendant's Motion for Summary Judgment must be denied.

### III. LEGAL ARGUMENT

#### A.  Plaintiff's Claims Are Not Time-Barred

Defendant contends in their Motion for Summary Judgment that Weakley's case should be dismissed because he neglected to file his Complaint with this Court within the ninety (90) days after the right-to-sue letter from the EEOC was issued and delivered via U.S. Mail. The Sixth Circuit expanded the "ninety-day" rule including an additional five (5) days allowing for the right-to-sue letter to be mailed to the recipient.  *See Cirotto v. Trader Publishing Company*, 2000 WL 33911295 (S.D. Ohio) citing *Banks v. Rockwell Int'l N. Am. Aircraft Operations*, 855 F.2d 324, 326 (6th Cir. 1988) (citing *Hunter v. Stephenson Roofing Co.*, 790 F.2d 472, 475 (6th Cir. 1986)). Therefore, the ninety-day limitations began five (5) days after the right-to-sue letter is issued by the EEOC. *See Cirotto v. Trader Publishing Compan*, 2000 WL 33911295 citing *Graham-Humphreys v. Memphis Brooks Museum of Art*, 209 F.3d 552, 557 (6th Cir. 2000).

Weakley's right-to-sue letter was issued on August 8, 2012 and was sent to Plaintiff and his counsel. Weakley testified in his deposition that he did not know when he received his letter from the EEOC and that his wife might have been the one to open the correspondence. (Ex. 1, Weakley Depo., p. 49). Plaintiff had ninety-five calendar days, or until November 11, 2012, to file his lawsuit. Defendant is correct that November 11, 2012, was his deadline, however, the 10th was a Saturday and the 11th was a Sunday. The courts were not open to receive filings.

13

Furthermore, the following day, Monday, November 12, 2012, was Veteran's Day in observance, and the Federal Courts were closed once more. Plaintiff filed his lawsuit the following business day, November 13, 2012. Cases cited by Defendant support Plaintiff's position. *Carter v. Jack Daniel's Distillery*, 2002 WL 32059015 (E.D. Tenn. Nov. 26, 2002)(plaintiff's ninety day time period does not begin to run until the expiration of five days from the date of mailing). The Court was closed on Mr. Weakley's 89th, 90th and 91st day.

**B.        Mr. Weakley was placed on probation and terminated because of his testimony in the *Cervantes* case.**

Mr. Weakley alleges he was subjected to illegal retaliation for testifying on behalf of a Mexican employee regarding racial slurs used by his supervisor, Larry Skinner, and Defendant's failure to remedy it in violation of Title VII. Specifically, Mr. Weakley contends that because of his protected activity he was terminated.

Title VII prohibits retaliation against an employee who has opposed discrimination. 42 U.S.C. § 2000e-3(a); *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 451 (2008); *Renfroe v. State Farm Mut. Auto. Ins. Co.*, 1999 U.S. Dist. LEXIS 7348, *15 (W.D. Tenn. May 7, 1999)(McCalla, J.).

A Plaintiff may satisfy his burden through either direct or circumstantial evidence. *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 543-544 (6th Cir. 2008); *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2002). Direct evidence is that evidence which, if believed, requires the conclusion that unlawful retaliation was a motivating factor in the employer's action and proves the existence of a fact without any inferences or presumptions. *Abbott* at 542. Furthermore, once the Plaintiff has produced direct evidence he does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action; the burden shifts to the

14

employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive. *Weigel v. Baptist Hops. Of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002)

Direct evidence does not require a full confession by the employer that the protected activity was in fact the motivating factor for termination. *Thibert v. City of Oregon, Ohio*, 724 F.Supp. 830 (N.D. Ohio 2010)  Furthermore, summary judgment is inappropriate if a reasonable jury could construe an employer's statements as direct evidence of retaliation and those statements are disputed issues of material fact. *Id.* at 838.  In *Thibert*, the Court was faced with a female police officer who had made verbal informal complaints of sexual harassment against fellow male officers. *Id.* at 833.  Thibert was told by her supervisor to reduce her allegations to writing. *Id.* at 833.   Thereafter, her employer began taking adverse employment actions against her such as transfer to Road Patrol, shift changes, cold shoulder treatment, and a failure to be promoted. *Id.* at 834-835.  Thibert filed her lawsuit alleging retaliation for informal complaints of sexual harassment.  The Court in denying the City's motion for summary judgment found the following evidence to constitute direct evidence:

> Here, the alleged statements of Stager [Chief of Police] and Mayor Brown, if believed by the jury, could be direct evidence of retaliatory motivation.  When Plaintiff and her union representative met with Stager to discuss her transfer to Road Patrol, she asked him whether the transfer was connected to her allegations of sexual harassment; Stager reportedly replied **"I'm not the one who put things in writing."  That statement, if believed, indicates a direct causal connection between Plaintiff's written harassment complaint and her transfer to Road Patrol.   Similarly, Mayor Brown allegedly referred to Thibert as a "turncoat" and allegedly encouraged Gulch to get rid of both officers.**  Whether Stager and Mayor Brown in fact said those words, and what they meant by them, are for the jury to decide.   Because a reasonable jury could construe those statements as direct evidence of retaliation, and because those statements are disputed issues of material fact, summary judgment is inappropriate.

*Thibert* at 838

In the case at bar, adjuster Crews called Larry Skinner and informed him of the issue with the door frames at First Baptist Church. Crews told Larry Skinner that he could fix the problem and make it work. Skinner ordered Crews not to fix the issue stating "no" and that this was another reason for him [Skinner] to "get him" or fire him, referring to Weakley. Clearly a reasonable jury could construe these statements and the temporal proximity of events as direct evidence of retaliation.

Further, Mr. Weakley has come forward with circumstantial evidence of illegal retaliation. As the U.S. Supreme Court has noted, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace v. Costa*, 539 U.S. 90, 100 (2003) (citing *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508 n. 17 (1957)). To establish a prima facie case of retaliation based on circumstantial evidence, Mr. Weakley must demonstrate that: (1) he engaged in protected activity; (2) which was known to Defendant; (3) he suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363 (6th Cir. 2001). The burden of establishing a prima facie case of retaliation is not onerous, but one easily met. *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999). On this point, the Sixth Circuit has held that "caution should be exercised in granting summary judgment once a plaintiff has established a prima facie inference of retaliation through direct or circumstantial evidence. *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 564 (6th Cir. 2004).[3] There is no dispute that

---

[3] This Court has previously cited *Singfield* for this proposition. *See Jeffrey Longs v. Ford Motor Co.*, W.D. Tenn. Case No. 2:07-cv-02653-JPM-cgc, Doc. 138: Order Denying Defendant's Renewed Motion for Judgment as a Matter of Law, at 8). As this Court noted in *Longs*, making factual determinations regarding an employer's retaliatory motives is unsuitable at the summary judgment stage or judgment as a matter of law stage.

Plaintiff meets the first three elements, that he engaged in protected activity, Defendant knew of the same and he suffered an adverse employment activity.

Once a plaintiff establishes a prima face case of retaliation, the burden of production shifts to the defendant to articulate a legitimate non-retaliatory explanation for the adverse employment action. *Id.* at 563. Should the defendant meet its burden of production, the burden shifts to the plaintiff to establish that the proffered reasons are pretextual. *Id.* at 564.

Importantly, evidence offered by Mr. Weakley to establish causation may also serve to establish pretext. *Cantrell v. Nissan North America, Inc.*, 145 F. App'x 99, 108 (6th Cir. Aug. 1, 2005) (holding "the same circumstances which established a causal connection between [the employee's] protected activity and her termination also serve as sufficient evidence" of pretext); *Wooley v. Madison County, Tennessee*, 209 F. Supp. 2d 836, 848 (W.D. Tenn. 2002) (holding same evidence used to establish causation could be used to establish pretext); *Long v. Procter & Gamble Mfg. Co.*, 2005 WL 2491551, at *6 (W.D. Tenn. Oct. 6, 2005) (same). In particular, the Sixth Circuit has held that demonstrating a causal connection between protected activity and the adverse employment action necessarily rebuts any alleged legitimate, nonretaliatory reason. *Cantrell*, 145 F. App'x at 108 n.2. Thus, the evidence offered by Mr. Weakley to establish a causal connection between his protected activity and the adverse actions he suffered also serves to establish pretext on Defendant's part.

As an initial matter, a causal connection (as well as pretext) may be established by temporal proximity alone. Indeed, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a casual connection for the purpose of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir.

2008); *see, e.g., DiCarlo v. Potter*, 358 F.3d 408, 421-22 (6th Cir. 2004) (holding that two-to-three week period between when employer learned of protected activity and took adverse action was sufficient evidence of causation). Mr. Weakley's last testimony of racial slurs by Larry Skinner was the *Cervantes* trial in May of 2011, he was then placed on probation and fired in August of 2011. Based on the temporal proximity between the Mr. Weakley' protected activity and his probation and termination, it is submitted genuine issues of material fact exist to render summary judgment inappropriate.

However, even if the Court requires additional evidence of causation/pretext, Mr. Weakley offers such additional evidence in this case, which buttresses his temporal proximity argument. *See, e.g., DeBoer v. Musashi Auto Parts, Inc.*, 124 Fed. Appx. 387, 393 (6th Cir. 2005) ("[s]uspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence."). With respect to "additional evidence" of causation/pretext, Plaintiff submits that after his testimony he was terminated for things he did not do as well incidents other employees have not been disciplined for, much less terminated. It is well settled that evidence that the defendant treated the plaintiff differently from similarly situated employees is relevant to causation. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

In *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 2013 WL 3155234 (2013) the United States Supreme Court, based upon principles of statutory construction, held that the standard for proving causation in Title VII retaliation cases is the "but for" standard, as opposed to the motivating factor standard. The *Nassar* case involved the burden-shifting analysis utilized in Title VII cases when a Plaintiff presents circumstantial evidence of discrimination. The Court ultimately held that the "mixed motive" method of proof available to plaintiffs who allege claims of status discrimination (i.e.: race or age) is not available to plaintiffs alleging

retaliation under Title VII.

In this case, Plaintiff has presented compelling direct evidence of retaliation such that the *Nassar* decision is not even relevant. However, the *Nassar* case should not alter the outcome in this case. A "but for" standard is not a sole cause standard. See *Miller v. American Airlines*, *Inc.*, 525 F.3d 520, 525 (7th Cir. 2008); *Jones v. Oklahoma City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010)(reversing trial court, which engaged in a "pretext-plus" analysis). In the case of *Dunn v. Automotive Finance Corp., et a/.*, Case No. 3:11-cv-01079 (M.D. Tenn. July 2013), Exhibit 30, the Court dispensed of a Defendant's attempt to rely upon *Nassar* to unduly limit the ability of a retaliation plaintiff to prove liability. In *Dunn*, the court was faced with a Plaintiff who had been terminated for engaging in protected activity but had also engaged in policy violations in the workplace. The Court determined it was a jury question as to what motivated the employer's decision to terminate. *Id.* at 21-22.

Plaintiff has put forth evidence that other mechanics, supervised by Larry Skinner and Sam Chitty, damaged equipment, doors and frames resulting in a financial impact to the company with no discipline let alone termination. Furthermore, the testimony is undisputed that the policy or practice at Defendant was for mechanics not to report damage to their supervisor but fix it themselves when brought to their attention. The door issue at First Baptist Church was never brought to Weakley's attention at the direction of his supervisor, Larry Skinner. Furthermore, there is a significant dispute as to who actually damaged the door.

An employer's deviation from standard, normal procedures when taking an employment action may also be used to establish pretext. *Skalka v. Fernald Environmental Restoration Management Corp.*, 178 F.3d 414, 422 (6th Cir. 1999) *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 590 (6th Cir. 2009)(stating that when an employer waits for a legal, legitimate reason to

fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee, the employer's actions constitute the very definition of pretext). There was no policy at Defendant that mechanics had to report damage to Larry Skinner, especially when they could fix it themselves. Furthermore, it is undisputed that mechanics other than Mr. Weakley were disciplined and terminated for damage to doors and frames.

### IV. Conclusion

As set out above there clearly exists genuine issues of material fact related to the motives of Defendant placing Mr. Weakley on probation and eventually terminating him. Defendant has failed to carry its burden under Fed. R. Civ. P. 56 and the same should be denied.

Respectfully submitted,

**ALLMAN & ASSOCIATES**

/s/ Andy L. Allman
Andy L. Allman, BPR No. 17857
R. Patrick Parker, BPR No. 16847
103 Bluegrass Commons Blvd.
Hendersonville, TN 37075
Telephone: (615) 824-3761
Facsimile: (615) 264-2720
andy@andylallman.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing has been forwarded by electronic means via the Court's electronic filing system this 12th day of November, 2013.

Lawrence S. Eastwood, Jr., Esq.
Megan M. Sutton, Esq.
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
211 Commerce Street
Nashville, TN  37201

*Attorney for Defendant*

/s/Andy L. Allman
Andy L. Allman