| | | |
|---|---|---|
| **MARK A. WEAKLEY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 3:12-CV-1180** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **NASHVILLE MACHINE ELEVATOR** | ) | |
| **COMPANY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Defendant Nashville Machine Elevator Company, Inc. ("Nashville Machine") has filed a Motion for Summary Judgment (Docket No. 20), to which plaintiff Mark Weakley filed a Response in opposition (Docket No. 27), and Nashville Machine filed a Reply (Docket No. 31). For the reasons stated herein, the Motion for Summary Judgment will be granted in part and denied in part, Weakley's Title VII retaliation claim will proceed to trial on certain theories of liability, and Weakley's remaining claims will be dismissed.

## BACKGROUND

## I.     The Motion for Summary Judgment

In support of its Motion for Summary Judgment, Nashville Machine filed (1) a Memorandum of Law (Docket No. 21), (2) a Notice of Filing that attached, *inter alia*, transcripts of the depositions of Mark Weakley, Sam Chitty, and Robert McMurray (Docket No. 22), (3) the Declaration of Samuel Chitty (Docket No. 23), and (4) a Statement of Undisputed Material Facts (Docket No. 24) ("Nashville Machine's SUMF").

In support of his opposition to the motion, Weakley filed (1) a Notice of Filing that

1

attached, *inter alia*, several deposition transcripts and other materials from the *Cervantes v. Nashville Machine* lawsuit (Docket No. 30, Exs. 2, 5, and 6-22) (relevant aspects thereof described herein)), as well as transcripts of depositions taken in this case (*id.*, Exs. 1 (Weakley), 3 (Anthony Barber), 4 (Richard Halfacre), 23 (Dale Crews), 24 (Chance Bawcum), 25 (Robert McMurray), 26 (Alan Hazelwood), 27 (Tim Aric), 28 (Bryan Connor), and 29 (Sam Chitty)), (2) a Response to Nashville Machine's SUMF (Docket No. 28), and (3) a Statement of Additional Undisputed Material Facts (Docket No. 29) ("Weakley's SUMF").

In support of its Reply, Nashville Machine filed a copy of Weakley's responses to certain discovery requests (Docket No. 31, Ex. 1) and a Response to Weakley's SUMF (Docket No. 32). With respect to an argument raised by Nashville Machine in its Reply concerning receipt of Weakley's notice of right to sue from the Equal Employment Opportunity Commission ("EEOC"), Weakley filed (with leave of court) a Supplemental Statement of Undisputed Material Facts (Docket No. 35), to which Nashville Machine filed a Response (Docket No. 36), and Weakley filed (with leave of court) a Second Supplemental Statement of Undisputed Material Facts (Docket No. 39), to which Nashville Machine filed a Response (Docket No. 41).

II.    **Overview**[1]

Between 1986 and September 23, 2011, Weakley worked on and off for Nashville Machine (among other companies), primarily as a "mechanic" involved in installing elevators.[2]

---

[1]Unless otherwise noted, the facts are drawn from the parties' respective statements of fact (taking into account their respective objections thereto) and the underlying record, drawing all reasonable inferences in favor of the plaintiff.

[2]The nature of Nashville Machine's workforce needs are cyclical.  The parties agree that, during the relevant time frame, Nashville Machine hired mechanics and other workers to meet staffing needs for elevator installations (such as installations associated with a construction

2

In May 2010, Nashville Machine laid off Weakley in the normal course of business.

On October 14, 2010, while employed by another company, Weakley was deposed in a lawsuit brought in this court by Weakley's former co-worker, Robert Cervantes, against Nashville Machine. *See Cervantes v. Nashville Mach. Co., Inc.*, 3:09-cv-0975 (M.D. Tenn. filed Oct. 16, 2009) (hereinafter, "*Cervantes*"). Cervantes, who is Hispanic, asserted claims against Nashville Machine for racial discrimination, harassment, and retaliation. (*Cervantes* Docket No. 1, Compl.) Among other things, Cervantes alleged in his complaint that his construction supervisor – later identified as Larry Skinner – routinely used racial epithets and derogatory terms when referring to Cervantes. (*Id.* ¶ 17.)[3] At deposition, Weakley testified that he had

---

project or remodeling project), that Nashville Machine would lay workers off when its staffing needs dropped, and that Nashville Machine would later rehire those workers when demand rose again. Weakley and other cyclical employees of Nashville Machine were members of the International Union of Elevator Constructors (the "Union"), which, in most relevant part, apparently provided lists of eligible candidates for rehire when Nashville Machine periodically sought to supplement its workforce. (*See* Docket No. 22, Ex. 3, Deposition of Sam Chitty, Ex. 10 (hiring lists).)

    [3]The court notes that Nashville Machine has objected to Weakley's recitation of and reliance on testimony from various witnesses in the *Cervantes* case, arguing that the materials are both irrelevant and improperly introduced because the transcripts (except for Weakley's deposition transcript in *Cervantes*) were not produced in discovery in this case. For purposes of the instant motion, the court takes judicial notice of (1) the *Cervantes* Complaint, (2) the fact that Weakley testified at deposition and at trial on behalf of Cervantes in *Cervantes*, and (3) the fact that Weakley's testimony specifically identified Larry Skinner as having made racially motivated comments in the workplace. The court will otherwise disregard the *Cervantes* materials and references in considering the motion. Weakley is advised that this trial will not be a vehicle to re-litigate the underlying claims in *Cervantes* in the hope of unduly prejudicing the jury against Nashville Machine. Of course, the jury will be required to hear at least some evidence related to the nature of *Cervantes*, but only to the extent it is relevant to Weakley's retaliation claim in this case. In light of the court's decision to consider only the referenced *Cervantes* materials herein, the court expresses no opinion at this stage as to Nashville Machine's argument that other *Cervantes* materials are inadmissible because Weakley failed to produce them in discovery.

3

observed Nashville Machine supervisor Skinner make racially motivated comments about Cervantes on multiple occasions.

On or about May 17, 2011, while employed by another elevator company (*i.e.*, not Nashville Machine), Weakley testified at trial in *Cervantes* on behalf of Cervantes. According to Weakley, the jury found for Cervantes (*see* Docket No. 27 at p. 5; Chitty Dep. at 102:19-22), after which the parties apparently settled the case. (*See Cervantes* Docket No. 62.)[4]

In July 2011, Nashville Machine elected to (re-)hire a mechanic to meet its business needs. Pursuant to its agreement with the Union, Nashville Machine was required to hire that mechanic from a list of eligible candidates provided by the Union, of which Weakley was one. Sam Chitty, who is Nashville Machine's general manager, was responsible for deciding whom to rehire. On July 12, 2011, Chitty chose Weakley over at least two other candidates, and Nashville Machine accordingly rehired Weakley.

As detailed herein, shortly after being rehired, Weakley was placed on probation and later terminated in connection with two elevator installation errors. On August 5, 2011 – just three weeks after rehiring Weakley – Chitty became aware that Weakley had improperly installed a door frame at an installation job at the First Baptist Church in Inglewood, Tennessee. Purportedly believing that Weakley had attempted to cover up his mistake by failing to report it,

---

[4]It is not entirely clear to the court how *Cervantes* was resolved. A May 23, 2011 docket notation in *Cervantes* states that the parties settled the case "during the jury's deliberation," and the parties thereafter filed a Stipulation of Dismissal on June 3, 2011 (*Cervantes* Docket No. 62). Here, Nashville Machine has not disputed Weakley's representation that "[t]he jury found in favor of the plaintiff in *Cervantes*" and "award[ed] compensatory and punitive damages." (Docket No. 27 at p. 5.) Therefore, notwithstanding the docket notation in *Cervantes* that the case was resolved "during the jury's deliberation", the court will assume Weakley's representation to be correct.

4

Chitty placed Weakley on probation for six months. In September 2011, during the probation period, Chitty became aware that Weakley had installed a damaged custom elevator door at a job site at the Veteran's Affairs Hospital in Murfreesboro, Tennessee ("VA Hospital"). Purportedly believing that Weakley had again covered up his mistakes by failing to report them to his supervisor, Chitty terminated Weakley for violating the terms of his probation.

In this lawsuit, Weakley claims that, in violation of Title VII, Nashville Machine terminated him in retaliation for testifying against Nashville Machine in the *Cervantes* case, rather than for the asserted performance deficiencies. Although Weakley's original Complaint alleged multiple claims under state and federal law, Weakley has both implicitly and explicitly abandoned all claims other than his Title VII retaliation claim.[5] Therefore, the court will dismiss those other claims without further analysis and will focus its discussion on the remaining Title VII retaliation claim.[6]

---

[5] Briefly, counsel for Weakley stated at Weakley's deposition that this "case is a retaliation and [retaliatory] harassment case . . . ." (Weakley Dep. at 57:5-13.) After the defendants argued in support of the instant motion that Weakley had abandoned his remaining claims (*see* Docket No. 21, Def. Mem., at p. 1 n.1; *see also* Docket No. 31, Def. Reply, at p. 1), Weakley did not respond, which itself constitutes implicit abandonment thereof.

[6] Although Weakley has purported to sue for "retaliatory harassment," Weakley's case is a traditional retaliation case. Aside from the act of placing him on probation and the act of terminating him – both of which are adverse actions – Weakley has not identified any pattern of "harassing" conduct by Nashville Machine. Therefore, the court does not construe Weakley as continuing to pursue the theory that Nashville Machine engaged in "severe or pervasive" retaliatory harassment, as would be required to support that theory of liability. *See Choulagh v. Holder*, 528 F. App'x 432, 438 (6th Cir. 2013) (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000)); *James v. Metro. Gov't of Nashville*, 243 F. App'x 74, 80 (6th Cir. 2007) ("Evidence of severe or pervasive supervisor harassment following a discrimination complaint can constitute retaliation for purposes of Title VII," provided that the harassment is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.") (quoting *Akers v. Alvey*, 338 F.3d 491, 498 (6th Cir. 2003)).

5

## II.    Weakley's Rehiring

Notwithstanding Weakley's representation to the contrary in his opposition papers, the undisputed facts show that Nashville Machine was not obligated to rehire Weakley on July 12, 2011 (when it did). The Union presented Chitty with a list of multiple eligible candidates. (*See, e.g.*, Chitty Dep., Ex. 10, Bates Number NMEC 0136 (listing multiple candidates in Nashville, including Wayne Hart, Kenny Yowell, Mark Weakley, and Zack Escobedo)). After narrowing the list to three people, Chitty believed that one of the individuals was unreliable and that the relative qualifications of the remaining two (one of whom was Weakley) were a "toss up." Chitty chose to rehire Weakley.[7]

## III.   The Two Incidents at Issue

### A.    First Baptist Church Incident in July/August 2011

In late July 2011, Weakley and his helper, David Cruz, were responsible for installing elevator doors on three floors at the First Baptist Church in Inglewood, Tennessee.[8] Although they installed the frames on the top two floors correctly, the door frames on the bottom doors were misaligned by 7/8 of an inch, which was a significant margin. Weakley claims that he

---

[7]In Weakley's SUMF, Weakley's counsel represented that Nashville Machine was obligated to hire Weakley, citing to Weakley's deposition testimony. However, as Weakley's testimony makes clear, Weakley simply believes that Nashville Machine was obligated to hire "through the bench" (*i.e.*, from the list of available candidates provided by the Union), but he does not actually know whether Nashville Machine was obligated to hire him on July 12, 2011. (*See* Weakley Dep. At 66:11-14 ("Q: [Y]ou don't know for a fact whether or not they could have passed you over? A: That is correct. That would have to be checked through the Union.").)

[8]In the elevator installations at issue, Weakley (along with a helper) was responsible for installing elevator door frames with proper alignment, after which another work crew would "block" in the frames and set up the wall, and, finally, an "adjuster" would double-check all of the work and make necessary adjustments.

would have noticed the error, except that, before Weakley had a chance to double-check the frame alignment, Skinner pulled him off of the job site to report to another job site.[9]

On or about August 5, 2011 (approximately two weeks after Weakley had done his portion of the installation), adjuster Dale Crews inspected the frames, identified the error with the first floor door frames, and reported the error to Skinner. Believing that it might be possible to fix the door without tearing down the wall (an expensive proposition), Crews asked Skinner if he (Crews) should attempt to fix the issue.[10] According to Crews, Skinner responded, "No, I want to get him. That's another reason for me to get him" – referring to Weakley. Crews construed Skinner as meaning that Skinner believed that, by not fixing the doors in the manner suggested as potentially feasible by Crews, it would provide a reason to "get [Weakley] fired or laid-off." (Crews Dep. 17:23-18:3.) Skinner accordingly directed Crews to tear down the wall and to align the doors, which Crews did.

After speaking with Crews, Skinner informed Chitty about the incident. Chitty questioned both Weakley and Cruz about what had happened. Cruz told Chitty that he (Cruz) had told Weakley about the mistake before the doors were blocked in, but that Weakley pressed

---

[9]Following resolution of the *Cervantes* case, it appears that Nashville Machine did not terminate Skinner, although Chitty recalled issuing him a verbal "reprimand" and informing Skinner that any future conduct similar to the accusations in *Cervantes* would result in termination. (*See* Chitty Dep. at 103:22-104:8.)

[10]According to Crews, he had once in his career adjusted doors that were 7/8 of an inch out of line without taking down the wall, and he believed that, with respect to the First Baptist Church job, "it could have been made to work" in this fashion. (*See* Crews Dep. at 18:18-19:22.) At the same time, Crews testified that undertaking that approach would mean that, at least latently, the doors would not have been "exactly right," although the customer likely never would have known the difference. (*Id.* at 18:8-17 and 19:1-5 ("[T]hey would probably never notice it.").)

forward with the installation despite knowledge of the mistake. By contrast, Weakley claimed to Chitty that he had no knowledge of the mistake until the adjuster, Crews, discovered it weeks later.[11] On August 5, 2011, Chitty sent a letter to Weakley, stating that he was being placed on probation for improperly installing the doors and for failing to alert his supervisor about the mistake. Chitty avers that he "believed at the time, and continue[s] to believe, that Mr. Weakley knew about the misalignment . . . ." (Chitty Decl. ¶ 9.) Weakley does not dispute this averment by Chitty. (*See* Docket No. 28, Weakley's Response to Nashville Machine's SUMF, Response to Fact No. 23 (stating that this fact is "undisputed").) Although Weakley claims that he believed the decision was unfair, he did not follow up with Chitty or file a grievance through the Union.

### B. VA Hospital Incident in September 2011

In mid- to late-September 2011, Weakley and Cruz again made a costly mistake, this time at the VA Hospital job site in Murfreesboro, Tennessee. According to Weakley, Cruz accidentally dropped the elevator door frame twice, causing some damage to it. Weakley claims that he saw only damage to the top of the frame, which he and Cruz fixed before installing the frame.

About one or two days later, adjuster Bryan Connor observed damage to the middle of the door frame that needed to be corrected. At deposition, Connor testified that Cruz told him that he (Cruz) had previously informed Weakley about the issue, but that Weakley had not reported it to his supervisor. Connor therefore reported the damage directly to Skinner,

---

[11]In his Response to Nashville Machine's SUMF, Weakley does not dispute the fact that Cruz told Chitty that he pointed out the mistake to Weakley before the doors were blocked in. (Docket No. 28, Response to Fact No. 22.)

informing Skinner that a third-party contractor would need to correct the job. The corrections cost $1,300.

After learning about the incident, Chitty spoke with both Weakley and the general contractor for the installation job.[12] According to Chitty, the general contractor told Chitty that it had previously complained to Weakley about the damage before the adjuster arrived, to no avail.[13] By contrast, Weakley acknowledged that the elevator doors had fallen twice, but he (1) denied having been told by the general contractor about the damage to the middle of the door, claiming that he was not aware of the damage until the adjuster, Connor, discovered it, and (2) to the extent that Nashville Machine wanted to identify a responsible individual, he blamed Cruz for the damage. Taking into account the information that the general contractor had provided to him, Chitty "believed at the time, and continue[s] to believe, that Mr. Weakley knew that the elevator door was damaged when it was installed . . . ." (Chitty Decl. ¶ 17.)

On September 23, 2011, Chitty and Skinner met with Weakley. Chitty told Weakley that he was being terminated because of the defective installation job at the VA Hospital, which he (not his helper) had failed to report to his supervisor. Chitty told Weakley that, as the mechanic on the job, he was responsible for the damage to the door. On that same date, Chitty sent a formal termination letter to Weakley, stating that Weakley was being terminated for violating his probation. Again, Weakley did not follow-up with Chitty or file a grievance with the Union.

---

[12]Although not explicitly stated in the record, the court infers that Nashville Machine was acting as a sub-contractor for the general contractor, which in turn had a contract with the owner of the job site.

[13]Chitty testified at deposition as to what the general contractor allegedly told him. The record does not contain testimony from that contractor or a contemporaneous written record of the referenced discussion.

9

## IV.    Post-Termination Incident

For reasons that are not clear from the record, in April 2012, Chitty aggressively pressed adjuster Crews to sign a written statement that Weakley had misaligned the door frames at the First Baptist Church by 7/8 of an inch.  Although he knew the statement was true, Crews initially refused to sign the statement because he did not want to "rat out" another employee.  When Crews initially refused to sign, Chitty took away Crews' work van, thereby requiring Crews' wife to pick him up.  Thereafter, Chitty threatened to terminate Crews for insubordination for refusing to write and sign the statement.  Fearing for his job, Crews relented, wrote out the statement, and signed it.

## V.    Alleged Comparators

Weakley has identified what he believes are examples of employees who engaged in similar conduct whom Nashville Machine did not formally discipline.  Nashville Machine vigorously disputes both (1) Weakley's characterizations of these events and (2) whether they are in fact analogous to the circumstances for which Weakley was disciplined.[14]

Weakley concedes that (1) he has not identified any employee who misaligned an elevator door frame and failed to notify his supervisor, (2) he has not identified any employee

---

[14]Notably, Weakley's discovery responses in this case accused multiple former co-workers of criminal activity and other forms of misconduct, including illegal drug use, theft, possession of child pornography, and drunk driving.  As a result of Weakley's sworn statements, several individuals whom Weakley had identified, including Bryan Connor, Alan Hazelwood, Tim Aric, Tony Barber, and Robert McMurray, filed grievances against Weakley with the Union, leading to a hearing concerning the veracity of the accusations that Weakley made in this case.  The Union ultimately found that Weakley had made inaccurate statements with respect to Hazelwood and Barber, for which the Union fined Weakley.  It is not clear from the record how the Union resolved the remaining grievances.  At any rate, Weakley admitted at deposition that he did not review his sworn statements carefully and that they contained multiple inaccuracies.

who was on probation, damaged an elevator door frame during the probation, and was nevertheless not terminated; (3) the conduct of the alleged comparators all occurred before the *Cervantes* trial; and (4) he has no personal knowledge as to whether any of the alleged comparators ultimately received discipline for their actions.

With these considerations in mind, and restricting the court's analysis to examples for which there is independent testimony (rather than speculation from Weakley), the alleged comparators are the following:

- Tony Barber and Tim Aric: In the early 2000s, while working on a project, Barber accidentally allowed a hoist to fall when the rope holding it snapped, destroying the hoist. After Barber informed Aric of the incident, Aric immediately called his supervisor to report what had happened. Neither Aric nor Barber was disciplined.

- Chance Bawcum: While working on an installation in the Green Hills area of Nashville, Tennessee at an unspecified time, Bawcum set three door frames wrong, all of which were "blocked up." Bawcum did not realize the mistake. At the end of the installation process, an unidentified individual observed that the doors were not correctly aligned and apparently told Skinner about the issue. Skinner contacted Bawcum and, according to Bawcum, gave him a "good cussing" but did not formally discipline him.

- Alan Hazelwood: At a job site on "West End," Hazelwood was responsible for installing elevator doors on a specialized type of elevator. Because Hazelwood mistakenly treated the installation as relating to a "regular" type of elevator, Hazelwood misaligned multiple door frames, which were then blocked in and sealed. According to Bawcum, who was working with Hazelwood at the time, Hazelwood did not look at the blueprints for the job, which "plainly stated" the proper alignment for that particular job. After realizing his mistake late in the installation process, Hazelwood alerted his supervisor and the mistake was corrected, potentially at significant expense.[15]

---

[15]Weakley also purports to identify an installation by Robert McMurray as a potential comparator. Weakley has not established the potential relevance of that example. McMurray simply testified that, on one occasion, he initially mis-installed a door frame, after which he "just loosened the bolts and put it where it needed to go." (McMurray Dep. at 11:18-12:4.) At deposition, Weakley's counsel failed to establish any details supporting the potential relevance of this example. Among other things, it is unclear (a) when the event occurred, (b) what the

11

Also, according to several deponents, including Weakley, Nashville Machine did not typically write up or discipline employees because of breaks, scratches, or other defective installations. For example, to the best of Weakley's knowledge and adjuster Robert McMurray's knowledge, Weakley was the first employee to receive a write-up, let alone be terminated, because of a break or scratch on installed elevator equipment. (*See* Weakley Dep. at 60:8-15 ("I have been with Nashville Machine for numerous years, never got wrote up because of a scratch or a dent. Things always happen. Everyone makes mistakes, everyone. Out of 26 or 27 years, to my knowledge, I have never been written-up for anything like that. I know of people dropping things, breaking things, installing things wrong . . . . And now that I have testified on Bobby's behalf, the first time something happens, I get wrote up on [sic] and the next time terminated . . . .")

VI. **Additional Facts**

Nashville Machine does not have a Human Resources department. With respect to the incidents at issue here, Chitty handled the administration of workplace discipline, and Chitty testified that he relied on Skinner to report to him any workplace violations by elevator mechanics meriting potential discipline. Although Nashville Machine has no written progressive disciplinary policy for the elevator division (in which Weakley worked), Chitty testified that he has generally applied progressive discipline in practice, except for infractions warranting immediate termination.

---

nature and/or severity of the mis-installation was, (c) whether McMurray self-corrected the issue without reporting it, whether he self-reported it, or whether he never reported it at all, and (d) who the supervisor was at the time.

12

## ANALYSIS

### I.     Timeliness of Weakley's Lawsuit

#### A.     Limitations Date and Five-Day Presumption

A Title VII plaintiff must bring suit within ninety days of receiving his or her right-to-sue letter ("RTS letter") from the EEOC.  42 U.S.C. § 2000e-5(f)(1); *Lockhart v. Holiday Inn Express Southwind*, 2013 WL 3870012, at *4 (6th Cir. July 29, 2013).  Within the Sixth Circuit, there is a rebuttable presumption that "the ninety-day limitations term begins running [] on the fifth day following the EEOC's mailing an RTS notification to the claimant's record residential address, by virtue of a presumption of actual delivery and receipt within that five-day duration." *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 557 (6th Cir. 2000); *see also Rucker v. Potter*, 215 F. App'x 406, 408 (6th Cir. 2007).[16]

Here, the EEOC issued a RTS letter dated August 8, 2012.  Weakley filed this lawsuit on November 13, 2012 – 97 days later.  The parties dispute whether Weakley's lawsuit was therefore untimely filed.

#### B.     Nashville Machine's Initial Position: Presumption Applies

In its initial brief in support of its Motion for Summary Judgment, Nashville Machine argued that the presumptive 5-day limitation *applied*, apparently believing that Weakley might claim to have received notice more than 5 days after August 8, 2012.  Relying on the presumption, Nashville Machine argued that the 90-day limitations date ran from August 13, 2012 – five days from the August 8, 2012 date on the RTS letter.  Therefore, according to

---

[16]As explained in *Graham-Humphreys*, "[t]he Sixth Circuit allots two days for postal delivery of a RTS notice beyond the three day period allowed by Federal Rule of Civil Procedure 6(e)."  209 F.3d at 557 n.9.

13

Nashville Machine, "the absolute last day for timely filing of the instant action was November 11, 2012, ninety days after the presumed delivery to Mr. Weakley." (Docket No. 21 at p. 12.) Thus, according to Nashville Machine, when Weakley filed this lawsuit on November 13, 2012, he was two days late.

Weakley admits that he has no knowledge as to when he actually received the RTS letter, which, as a general matter, triggers application of the five-day presumption. However, as Weakley pointed out in his response brief, Nashville Machine's initial position was without merit, because November 11, 2012 fell on a Sunday, and November 12, 2012 was a federal holiday. Therefore, assuming that the five-day presumption applied, Weakley had until November 13, 2012 – the first business day after November 11, 2012 – to file his Complaint. Weakley in fact filed this lawsuit on that date.

### C. Nashville Machine's Alternate Position: Presumption Does Not Apply

In its Reply, Nashville Machine did not dispute Weakley's position that, if the presumption applied (as Nashville Machine had initially argued), Weakley's November 13, 2012 Complaint was timely. However, Nashville Machine switched positions, arguing for the first time that the presumption did *not* apply. In support of this argument, Nashville Machine contended that, because Weakley's attorney *may* have received the RTS letter on or before August 12, 2013, Weakley may have been on constructive notice before that date, thereby starting the limitations clock before August 13, 2012. Nashville Machine's switch in positions caused the parties to file several additional submissions concerning this issue.

It is undisputed that, while Weakley's discrimination charges were pending with the EEOC, Mr. Allman wrote to the EEOC on November 16, 2011 to request that the EEOC

14

"forward" to him any future correspondence or documents concerning the case at his address at the law firm of "Kelly, Kelly, and Allman." On January 1, 2012, Mr. Allman left that law firm and changed addresses. The record shows that Allman wrote to the EEOC to inform it of this change of address on February 23, 2012, although Nashville Machine argues that the court should not consider this document pursuant to Fed. R. Civ. P. 37, because Weakley did not produce it in discovery in this case. At any rate, Nashville Machine does not dispute that it possesses (and presumably received at the time) a copy of a letter from Allman to the EEOC on February 6, 2012, bearing Mr. Allman's updated address. That letter included Weakley's consent to mediate the charges.

As to the August 8, 2012 RTS letter itself, the letter was addressed to Weakley and included a copy to Mr. Allman at his outdated "Kelly, Kelly, & Allman" address. (*See* Weakley Dep., Ex. 8.) Mr. Allman admits that, at some point, he received a copy of the RTS letter, but he cannot recall the date. His submissions suggest that the EEOC may have sent the RTS letter to the wrong address.

### D.    Nashville Machine Pivots Again

In its Response to Weakley's First Supplemental SUMF, Nashville Machine contended that Mr. Allman failed to notify the EEOC of his change of address. Nashville Machine contended that the court should therefore presume that Mr. Allman had received the RTS letter in under five days, because Mr. Allman's own failure to update the EEOC may have caused Mr. Allman not to receive the letter beyond that five-day window.

In response, Mr. Allman filed a February 23, 2012 letter in which he specifically informed the EEOC of his change of address. Nashville Machine argues that the court should

15

disregard the letter under Rule 37, although it is not clear to the court that the document should have been produced in the first place.[17]

### E. Resolution of the Presumption Issue

Nashville Machine originally took the position that *the five-day presumption applies* and that, as a consequence, Weakley's lawsuit was untimely because it was not filed by November 11, 2012. Weakley's opposition brief convincingly rebutted this argument and showed why filing on November 13 was timely. Then Nashville Machine, after recognizing the validity of Weakley's response, changed positions in its Reply. Be that as it may, Weakley has not challenged the procedural propriety of Nashville Machine's belated argument; instead, he has addressed it through supplemental statements of fact, supported by a declaration from Mr. Allman.

The record contains no evidence that Mr. Allman actually received the RTS letter before August 13, 2012, which is the operative factual issue. Although the court might approach the issue differently if attorney Allman had switched addresses in secret as some type of stratagem to buy his client extra time, the record does not support such an inference. Instead, the record indicates that the EEOC mailed the letter to Weakley in the first instance and that Nashville

---

[17]Specifically, it is not entirely clear to the court whether a particular discovery request identified by Nashville Machine required the production of all records related to Weakley's EEOC charges against Nashville Machine. Nashville Machine's Request for Production No. 11 sought "all documents that refer or relate to any civil lawsuits [], administrative or criminal charges, and/or claims, *other than this lawsuit*, which you commenced or participated in, or threatened to commence or participate in." (Docket No. 31, Request for Production No. 11 (emphasis added).) As the request is worded, it is not self-evident whether Nashville Machine sought records related to the administrative charges related to "this lawsuit" – *i.e*, whether the qualifier "other than this lawsuit" refers to the term "administrative . . . charges." The court notes that neither party has filed a copy of Weakley's written response to Nashville Machine's discovery request.

Machine was aware before this lawsuit that Mr. Allman had communicated with the EEOC on letterhead bearing his updated address. Furthermore, aside from a broad request for records relating to "any" administrative proceeding or lawsuit other than "this lawsuit," Nashville Machine has not shown that it engaged in targeted discovery concerning the date on which *Mr. Allman* received the RTS letter.

Nashville Machine cites several cases in which plaintiffs or their attorneys were not entitled to tolling of the 90-day requirement, where the plaintiffs and/or their attorneys failed to notify the EEOC of an address change. *See, e.g.*, *Reschny v. Elk Grove Plating Co.*, 414 F.3d 821, 823-24 (7th Cir. 2005); *Moore v. Henderson*, 174 F. Supp. 2d 767, 773-74 (N.D. Ill. 2001). However, in each of those cases, the plaintiffs sought to file suit *years* after the right-to-sue letter and requested tolling, notwithstanding the fact that their failure (and/or their counsel's failure) to notify the EEOC of a change of address caused them not to receive the notice for such a long time. The courts in each case understandably found that equitable tolling of the limitations date was not warranted under those circumstances. In contrast to the circumstances presented here, none of the cited cases involved the application of the five-day presumption of receipt running from the date of a right-to-sue letter itself. Here, Weakley is not arguing for tolling of the statute of limitations as such; he is merely relying on the Sixth Circuit's construction of the Federal Rules of Civil Procedure, which the Sixth Circuit has construed as affording a plaintiff an additional five days beyond the 90 day-limitations date, provided that there is no evidence of actual receipt before that date.

Here, even assuming *arguendo* that the limitations clock would have run from the date on which Allman or his former office actually received the RTS letter, Nashville Machine has not

17

provided any evidence that Weakley's counsel actually received the notice before August 13, 2012. Thus, Nashville Machine has not presented evidence to displace the presumption. The five-day presumption therefore applies, and the court finds that Weakley filed this lawsuit in the appropriate time frame.[18]

## III. <u>Merits of Weakley's Retaliation Claim</u>

Title VII forbids an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Title VII's anti-retaliation provision "seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms." *Burlington N. & Sante Fe Railway Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)). Retaliation claims can be proven through direct evidence or circumstantial evidence.

### A. **Direct Evidence Theory**

Direct evidence of discriminatory intent is "evidence which, if believed, requires the

---

[18]Although the court agrees that Allman's inability to identify the actual receipt date by his office is not commendable, the court finds no basis to displace the five-day presumption under the specific circumstances presented. If Nashville Machine had pursued this issue more directly in the discovery process, it may be that the date on which Mr. Allman's current or former office received the notice could have been ascertained, or that the record would have demonstrated some type of inexcusable neglect on Mr. Allman's part. However, in the absence of any evidence showing otherwise, the court must presume that both Weakley and his counsel received the right-to-sue letter on August 13, 2012.

18

conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999); *see also Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010) ("Direct evidence is evidence, which if believed, does not require an inference to conclude that unlawful retaliation motivated an employer's action.")  Here, Weakley argues that Skinner's statement to Crews that Skinner wanted to "get" (*i.e.*, fire) Weakley constitutes direct evidence of discrimination.  This argument is without merit: Skinner's statement does not require the conclusion that, by saying "get him," Skinner meant that he wanted to get Weakley fired specifically because Weakley testified in the *Cervantes* trial.  For example, a factfinder reasonably could infer that Skinner intended to engineer Weakley's termination for a reason that had nothing to do with Weakley's testimony in *Cervantes*, such as a personality conflict or because Skinner believed Weakley was a subpar mechanic.  Therefore, although Skinner's statement provides *circumstantial* evidence of retaliatory animus, the statement is not direct evidence.

> **B.** **Circumstantial Evidence**
>
> > 1. Standard

A claim for retaliation under Title VII based on circumstantial evidence is governed by the *McDonnell Douglas* burden-shifting framework.  A plaintiff must first make a *prima facie* case by showing that (1) he engaged in protected activity; (2) the employer knew of the protected right; (3) an adverse employment action was subsequently taken against him; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Imwalle*, 515 F.3d at 544.  Once a plaintiff carries his *prima facie* burden, the burden shifts to the

defendant to produce a legitimate, non-discriminatory reason for its adverse action.  *Id.*; *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004).  If the defendant satisfies this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation for engaging in the protected activity.  *Id.*

2.    *Prima Facie* Case

Here, the parties do not dispute that Weakley engaged in protected activity by testifying in October 2010 (at deposition) and May 2011 (at trial) in *Cervantes*, that Nashville Machine was aware of Weakley's protected activity, and that Nashville Machine took two adverse actions against Weakley (probation and termination).  However, the parties dispute whether Weakley has provided evidence supporting a "causal connection" between his protected activity and Nashville Machine's decision to terminate him.

As a general matter, a plaintiff's *prima facie* burden, including the "causal connection" element, is a burden that is "easily met."  *See Herrera v. Churchill McGee, LLC*, No. 13-5211, 2013 WL 6126150, at *3 (6th Cir. Nov. 21, 2013).  Although the Sixth Circuit has not been entirely consistent on this point, it has found that a short time period between the protected activity and the adverse action can be sufficient to establish the "causal connection" element. *See id.* (collecting cases); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (three-month proximity sufficient); *Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006) (two months sufficient).

Here, Weakley last engaged in protected activity on May 17, 2011, when he testified in the *Cervantes* trial.  After Nashville Machine rehired Weakley on July 12, 2011, Nashville

20

Machine formally disciplined him and placed him on probation on August 5, 2011, approximately ten weeks later, and terminated him on September 23, 2011, approximately four months after his testimony in *Cervantes*. Notably, in connection with the earlier of these two events, Skinner told Crews to refrain from attempting to correct the mistake at the First Baptist Church so that Skinner could "get him" (referring to Weakley). Skinner's statement suggests that, within ten weeks of Weakley's rehiring (by Chitty), Skinner targeted Weakley in the hope that reporting Weakley might get him fired. Skinner's report to Chitty was the catalyst for Weakley's probation and ultimate termination for engaging in a second infraction reported to Chitty.

Because the August 2011 event occurred within ten weeks of Weakley's protected activity and in light of Skinner's statement, the court finds that Weakley has met the "low burden" of establishing his *prima facie* case, thereby requiring Nashville Machine to provide a legitimate, non-retaliatory reason for placing him on probation and terminating him.

### 3.   Legitimate Non-Discrimination Reasons

Nashville Machine has offered legitimate, non-discriminatory reasons for both of the adverse actions it took against Weakley. First, it contends that it placed Weakley on probation for failing to install an elevator door at the First Baptist Church in Inglewood, Tennessee, and for failing to inform his supervisor about the incident. Although he disputes his blameworthiness for this incident and its severity, Weakley acknowledges that he had installed the door, that it in fact was improperly installed, that he did not inform his supervisor about it, and that it cost Nashville Machine money to fix it. Second, Nashville Machine contends that it terminated Weakley because, during his probationary period, Weakley installed a visibly damaged elevator

door frame at the VA Hospital in Murfreesboro. Again, although Weakley disputes his awareness of the incident and blameworthiness for it, he admits that the door in fact was damaged, that he did not inform his supervisor about the incident, and that it ultimately cost Nashville Machine money to fix it. Accordingly, the court finds that Nashville Machine has met its burden of production to provide legitimate reasons for its adverse actions, thereby shifting the burden back to Weakley to prove pretext.

                4.     <u>Pretext</u>

To show pretext, Weakley must demonstrate by a preponderance of the evidence that Nashville Machine's proffered reasons are actually pretext for unlawful discrimination. *Brown v. Lexington-Fayette Urban Cnty. Gov't*, No. 12-6597, 2013 WL 6486771, at * 5 (6th Cir. Dec. 11, 2013) (citing *McDonnell Douglas*, 411 U.S. at 802, and *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003)). To demonstrate pretext and thereby defeat Nashville Machine's motion, Weakley may show that Nashville Machine's reasons for his probation and termination: (1) had no basis in fact; (2) did not actually motivate Nashville Machine; or (3) were insufficient to explain its conduct. *Brown*, 2013 WL 6486771, at *5 (citing *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009)). Ultimately, Weakley must show that "the desire to retaliate was the but-for cause of the challenged employment action." *Bishop v. Ohio Dep't of Rehab. & Corrs.*, 529 F. App'x 685, 696 (6th Cir. 2013) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013)). Here, Weakley has not specified which of the three theories of liability he is pursuing, although his arguments and/or supporting materials touch on all three lines of argument.

                a.     No Basis in Fact/Honest Belief Defense

At times, Weakley suggests that Chitty was actually wrong about the underlying facts of each incident, because Chitty should not have credited (1) Cruz's representation that he had told Weakley about the misaligned door with respect to the August 2011 installation, and/or (2) the general contractor's representation that he had told Chitty about the damage to the door frames.

In the pretext inquiry, when a plaintiff challenges the factual basis for an employer's adverse action, the Sixth Circuit applies a modified version of the "honest belief" rule:

> [A]n employer's proffered reason is considered honestly held where the employer can establish it reasonably relied on the particularized facts that were before it at the time the decision was made. Thereafter, the burden is on the plaintiff to demonstrate that the employer's belief was not honestly held. An employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine dispute of material fact.

*Seeger v. Cincinnati Bell Tele. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (internal brackets omitted) (quoting *Joostberns v. United Parcel Serv., Inc.*, 166 F. App'x 783 (6th Cir. 2006)).[19] To overcome an employer's honest belief, the plaintiff must show more than a dispute over the facts upon which the discharge was based. *Seeger*, 681 F.3d at 285. The employer's decision-making process under scrutiny is not required to be "optimal or [] leave no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)); *see also Tibbs v. Calvary United Methodist Church*, 505 F. App'x 508, 514 (6th Cir. 2012).

Here, Weakley has made no meaningful attempt to show that Chitty did not honestly

---

[19]As explained in *Jones v. Unipres*, 2013 WL 5782930, at *10 n.13 (M.D. Tenn. Oct. 28, 2013), this court has construed the "honest belief" rule as applicable only to the "no basis in fact" theory of pretext.

believe that Weakley had tried to cover up both errors by failing to report them.  Although Weakley continues to dispute whether Chitty was actually correct about those underlying facts, that dispute is beside the point for purposes of a "no basis in fact" theory of pretext.  The undisputed facts show that, in connection with both incidents, Chitty was informed (by Cruz as to the first incident, by the general contractor as to the second) that Weakley had failed to report defective or damaged elevator doors despite being warned about those problems during the installation process.  The undisputed facts also show that Chitty relied on this information in deciding to place Weakley on probation and termination.  Thus, even if Chitty were actually incorrect about the underlying facts, his beliefs as to what actually happened were honestly held, thereby precluding a finding of pretext based on the "no basis in fact" approach.

> b. Insufficient to Warrant Probation and Termination

To demonstrate that Nashville Machine's reasons were insufficient to motivate its conduct, Weakley must show "circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant." *Russell v. Univ. of Toledo*, 537 F.3d 596, 607 (6th Cir. 2008) (quoting *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).  To do so, the employee ordinarily must show "by a preponderance of the evidence that 'other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge [of the plaintiff].'"  *Blizzard v. Marion Tech. College*, 698 F.3d 275, 286-87 (6th Cir. 2012 (quoting *Manzer*, 29 F.3d at 1084).

The parties argue at some length about whether Weakley has identified sufficiently analogous comparators.  As an initial matter, at least some of the asserted comparators are

plainly not relevant to this case, including the McMurray example. The court also finds that examples of criminal conduct by other employees outside of work is irrelevant to the "comparator" inquiry because they have nothing to do with the type of mistakes that Weakley committed after being rehired in July 2011.[20]

Furthermore, as Nashville Machine points out, although Weakley has identified a number of individuals who made serious installation mistakes that Nashville Machine tolerated, none of those examples involved an employee who made a mistake, appreciated that mistake, and yet failed to self-report it to his supervisor. Although the court agrees that this distinction is potentially relevant, the court finds that it will be for the jury to decide whether that distinction precludes a finding of pretext. In particular, there is a genuine dispute of material fact at least with respect to Chance Bawcum. As explained above, Bawcum set the door frames incorrectly at an installation job in Green Hills, Bawcum claims not to have realized his mistake, the mistake was later discovered by another person, the mistake was corrected, and Bawcum was not disciplined for failing to report the error.

Furthermore, there is testimony in the record, from Weakley and others, that Nashville Machine typically tolerated some degree of mistakes by its employees without disciplining them. Although some of this testimony lacks specificity, any vagueness will be an appropriate subject for cross-examination and consideration by the jury at trial.

           c.        Did Not Actually Motivate

---

[20]Moreover, they prove nothing here, because Weakley himself was charged with domestic assault three times before his termination. At any rate, even if it were true that Nashville Machine employed a "rogues' gallery" of mechanics, that fact does not tend to prove that placing Weakley on probation and terminating him for making two costly mistakes was pretext for retaliating against Weakley for testifying in *Cervantes*.

25

To show that Nashville Machine's stated reasons did not actually motivate Weakley's probation and discharge, the employee must present "additional evidence" showing that the employer was "motivated by illegal reasons considering both the employer's stated reason and evidence the employer offers in support of such reasons." *Manzer*, 29 F.3d at 1083. "This argument is, essentially, that [the employer's] proffered reasons did not actually motivate [the] discharge. "This method of proving pretext requires that the plaintiff admit the factual basis underlying the employer's explanation and further admit that such conduct could motivate dismissal." *Blizzard*, 698 F.3d at 287 n.6 (internal quotation marks, citations, and brackets omitted).

Although not squarely addressed by the parties here, the court observes that the Sixth Circuit has recognized that a "cat's paw" or "rubber stamp" theory can apply to Title VII retaliation claims. *See Bishop*, 529 F. App'x at 696. Under that theory of liability, "[w]hen an adverse . . . decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, [the Sixth Circuit] has held that the employer may be held liable under a 'rubber stamp' or 'cat's paw' theory of liability." *Id.* (quoting *Arendale v. City of Memphis*, 519 F.3d 587, 604 n.3 (6th Cir. 2008)); *see also Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 586 n. 5 (6th Cir. 2009) ("The 'cat's paw' theory refers to a situation in which a biased subordinate, who lacks decisionmaking power, influences the unbiased decisionmaker to make an adverse . . . decision, thereby hiding the subordinate's discriminatory intent.") To succeed on a "cat's paw" theory, the employee "must offer evidence of a 'causal nexus' between the ultimate decisionmaker's decision to terminate the [employee] and the supervisor's discriminatory animus." *Bishop*, 529 F. App'x at 696

26

(quoting *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 677 (6th Cir. 2008)).  In

other words, the employee must show that, "[b]y relying on the discriminatory information flow,

the ultimate decisionmakers acted as the conduit of the supervisor's prejudice – his cat's paw."

*Bishop*, 529 F. App'x at 696 (quoting *Madden*, 549 F.3d at 678).

Also, "[w]hen an employer waits for a legal, legitimate reason to fortuitously materialize,

and then uses it to cover up his true, longstanding motivations for firing the employee, the

employer's actions constitute the very definition of pretext."  *Upshaw v. Ford Motor Co.*, 576

F.3d 576, 590 (6th Cir. 2009) (quoting *Jones v. Potter*, 488 F.3d 397, 408 (6th Cir. 2007)

(internal quotation marks and ellipsis omitted)).

Here, Weakley has presented evidence that, even if he did commit mistakes for which he

was responsible in August 2011 and September 2011, his job performance deficiencies may not

actually have motivated Nashville Machine's conduct.

First, the record contains evidence that Skinner capitalized on the August 2011 incident

as a chance to "get" Weakley fired.  Weakley's testimony in *Cervantes* identified Skinner as

having repeatedly used racial slurs to describe Cervantes.  Under the circumstances, a jury could

find that, by attempting to "get him," Skinner meant to retaliate against Weakley for painting

Skinner in a bad light in *Cervantes*.  The jury could also find that Skinner acted on that intent by,

at the first opportunity, reporting Weakley to Chitty for a workplace error that either could have

been corrected without reporting it (by letting adjuster Crews attempt to fix the issue himself) or

that would otherwise have been overlooked for disciplinary purposes.[21]  Skinner's report

---

[21]Remarkably, the record contains no testimony from Skinner; thus, Crews' description of
what Skinner told him is undisputed

precipitated Chitty's decision to place Weakley on probation.  By contrast, if Skinner had not reported the incident and Chitty accordingly had not placed Weakley on probation in August 2011, it is possible that Chitty would not have chosen to terminate Weakley for the flawed installation job in September 2011. Thus, even assuming that Chitty honestly believed that Weakley had made performance errors that could have merited probation and, ultimately, termination, there is a genuine dispute of material fact as to whether there is a causal nexus between Skinner's (potentially) retaliatory animus and Chitty's ultimate decision to place Weakley on probation in August 2011.

Second, a jury could interpret Chitty's pursuit of Crews for an adverse statement against Weakley as evidence of pretext.  In April 2012, Chitty threatened Crews with termination for refusing to sign a statement concerning Weakley's installation work back in late July 2011. Even though Chitty was simply asking Crews to provide a truthful statement, it is not clear why, six months after Weakley's termination and nearly eight months after the First Baptist Church job, Chitty would have gone to such extremes to extract an unsworn signed statement from Crews.  A factfinder could interpret Chitty's actions as an attempt to provide retroactive validation for Chitty's decisions, in an attempt to disguise Chitty's true motivation at the time he placed Weakley on probation and (later) terminated him.

Certainly, Weakley may have an uphill climb at trial.  Nashville Machine, via Chitty, rehired Weakley *after* the *Cervantes* trial over at least two other employees, which may make it difficult to show that Chitty harbored a discriminatory motive.[22]  Also, Weakley did not file a

---

[22]These facts could warrant a jury instruction on the "same actor" inference, "which allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee."  *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463 (6th Cir. 1995);

Union grievance concerning either incident, which a jury could construe as Weakley's implicit acknowledgment that the discipline was valid. Furthermore, Weakley has not identified any specific employees who, to the best of Nashville Machine's knowledge, covered up a mistake and were later caught but not terminated. Finally, Weakley has not identified any documents reflecting that Nashville Machine harbored a retaliatory motive. Notwithstanding these significant hurdles, the court finds that, although it a close question, Weakley has produced sufficient evidence to create a genuine dispute of material fact concerning pretext.

In sum, the court finds that summary judgment on Weakley's Title VII retaliation claim is not warranted.

## CONCLUSION

For the reasons stated herein, the Motion for Summary Judgment will be granted in part and denied in part, Weakley's Title VII retaliation claim will proceed to trial on certain theories of liability, and Weakley's remaining claims, including his retaliatory harassment claim, will be dismissed with prejudice.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

*Hartsel v. Keys*, 87 F.3d 795, 804 n.9 (6th Cir. 1996).